UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROGENT YOUNG,

Petitioner,

v.

KENNETH GENALO, et al.,

Respondents.

26 Civ. 4543 (DEH)

**OPINION AND ORDER**

DALE E. HO, United States District Judge:

Rogent Young ("Petitioner" or "Mr. Young") has lived in the United States and held lawful permanent resident status for more than thirty years. After U.S. Customs and Border Protection ("CPB") determined that Mr. Young was removeable based on a 1997 misdemeanor conviction, Immigration and Customs Enforcement ("ICE") detained him pursuant to 8 U.S.C. § 1226(a) ("Section 1226(a)" or "§ 1226(a)"), without making an initial determination as to whether such detention was justified based on any purported danger posed by Mr. Young to the community or whether he presented a risk of flight. At a subsequent administrative hearing, an Immigration Judge ("IJ") placed the burden on Mr. Young to establish that detention was not justified, rather than on the Government to show that it *was*, and without considering alternatives to detention, denied him release on bond. Mr. Young then challenged his detention in this Court, seeking immediate release from custody, or in the alternative, a new bond hearing. Am. Pet. for Writ of Habeas Corpus ("Pet.") ¶¶ 6-8, ECF No. 21.

At the conclusion of hearing held on August 31, 2026, this Court ordered that the Petition be **GRANTED** and directed Mr. Young's immediate release from ICE custody, with a written opinion to follow, which the Court now issues.

## BACKGROUND

Mr. Young was born in Jamaica and has lived in the United States since 1992. Decl. of Melanie Gold ("Gold Decl.") ¶ 7, ECF No. 23. He has also held lawful permanent resident ("LPR") status since 1992, and currently works as a cable technician. *Id.* ¶¶ 7, 10. In 2007, Mr. Young married Michelle Gordon Young, a U.S. citizen. *Id.* ¶ 11. The couple have lived together in Brooklyn since 2005 and have three U.S. citizen children, ages 16, 17, and 18. *Id.* ¶¶ 11-12. Ms. Young is hearing impaired and relies on Mr. Young's help in the home. *Id.* ¶ 11. Mr. Young has been the primary financial provider for his family. *Id.* ¶ 14. Mr. Young also has four adult U.S. citizen children from prior relationships, two of whom are actively serving in the United States military. *Id.* ¶ 12. He regularly spends time with his father, who has Parkinson's disease. *Id.* ¶ 15. Mr. Young has renewed his LPR status on several occasions; because LPR status remains valid for ten years, the parties agree that his most recent renewal must have occurred no earlier than 2017. *See* Tr. of Hearing, Aug. 31, 2026 ("Hearing Tr.") at 5:3-14, 34:9-17, ECF No. 35.

Mr. Young has had three criminal convictions, the most recent of which was approximately eight years ago. First, in 1997, when Mr. Young was 19 years old, he was convicted of New York Penal Law ("NYPL") § 260.10(1), for the misdemeanor offense of "knowingly act[ing] in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." Gold Decl. ¶ 16-17. He received a sentence of probation. *Id.* ¶ 20. Second, in 2015, Mr. Young was convicted of New York Vehicle and Traffic Law ("VTL") § 1192(1), operating a motor vehicle while under the influence of alcohol, a vehicular offense for which he was sentenced to a one-year conditional discharge and a 90-day driver's license suspension. *Id.* ¶ 21; Pet. ¶ 23. And third, in 2018, Mr. Young was convicted of VTL § 511(2)(A)(i) for the misdemeanor offense of aggravated unlicensed operation of a motor vehicle, for which he was sentenced to a one-year conditional discharge. Gold Decl. ¶ 22; Pet. ¶ 24. Separately, Mr. Young was also arrested twice,

in 2011 and 2025, but the charges against him in connection with those two arrests were dismissed and sealed in his favor. Gold Decl. ¶ 16. He has no other criminal record. There is no indication that Mr. Young has missed any appearances in connection with any of these proceedings or any immigration-related matters.

The facts underlying Mr. Young's detention are as follows. Mr. Young returned to New York from a trip to Jamaica on February 2, 2026, where he was arrested by CBP at John F. Kennedy Airport. Pet. ¶ 27. When he was arrested, he was issued a Notice to Appear ("NTA") identifying the basis for his removal as pursuant to "Section 237(a)(2)(E)(i) of the Immigration and Nationality Act," and citing his 1997 conviction for "a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment." NTA at 1, ECF No. 23-3. The NTA does not address the issue of whether Mr. Young should or would be detained. *See id.*; Hearing Tr. at 78:7-11 (attorney for the Government explaining that the NTA "states what the basis for removal is," which "is distinct [from] the question of . . . what is the proper custody determination."). He was held in the custody of ICE since around that time, *see* Gold Decl. ¶ 4, until the Court ordered his release after the August 31, 2026 hearing in this matter.

On February 5, 2026, the Government issued Mr. Young two documents: a Form I-286 Notice of Custody Determination characterizing his detention as pursuant to 8 U.S.C. § 1226, ECF No. 6-2, and a Form I-200 warrant for his arrest, ECF No. 6-3. The Government has represented that the basis for detention was "the execution of a charging document to initiate removal proceedings and the pendency of ongoing removal proceedings," *id.* at 1; neither document contains a determination of Mr. Young's dangerousness or risk of flight. Mr. Young was then detained at Orange County Correctional Facility ("OCCF"). Gold Decl. ¶ 4.

While detained at OCCF, Mr. Young experienced several significant medical issues, arising from conditions including type 2 diabetes and neuropathy. *Id.* ¶¶ 23-25. His family has

also endured significant financial hardship since his detention. Mr. Young is the primary source of income for his family, who have fallen behind on their bills and lost their car. *Id.* ¶ 14. Two of his children are minors, and his 18-year-old daughter, who had been planning on enrolling in college this fall has put her plans on hold. *Id.* Additionally, Mr. Young's father, who suffers from Parkinson's disease, has been struggling since Mr. Young's absence. *Id.* ¶ 15.

Mr. Young appeared for a custody redetermination hearing before an IJ on May 27, 2026. The IJ denied bond. Decision and Order ("Bond Order") at 4-5, ECF No. 23-5. The IJ's written ruling did not address the issue of risk of flight, *see id.* at 4, but the IJ stated in her oral opinion, "I do not believe he is a flight risk." Tr. of Bond Hearing, May 27, 2026 ("Bond Hearing Tr.") at 16:5, ECF No. 6-7. The IJ nevertheless denied release on bond after "find[ing] that [Mr. Young] has not met his burden of proving that he is not a danger to the community." Bond Order at 2; *see also id.* at 4; Bond Hearing Tr. at 15:19-16:6 ("[T]he law is that the Department of Homeland Security does not bear the burden by clear and convincing evidence but rather it is the respondent's burden of proof to show that he is not a danger or a flight risk."). The IJ reached this conclusion in part based on Mr. Young's decision not to offer testimony regarding the circumstances of his 1997 child endangerment conviction. *See* Bond Order at 3 (IJ stating that, "[a]s it is his burden in these proceedings, the Court draws a negative inference from his refusal to testify about the circumstances of this arrest and finds that his insistence on keeping pertinent details from the Court heightens his overall dangerousness."); *id.* at 2 n.2 (faulting Mr. Young for "fail[ing] to provide any evidence on this previous conviction, despite bearing the burden of proof in these proceedings."). Thus, as the Government acknowledged in its brief, "the burden allocation affected how the Immigration Judge treated the resulting uncertainty: because Petitioner bore the burden, the Immigration Judge drew a negative inference from his refusal to testify concerning the 1997 incident." Resp't's Mem. of L. in Opp'n to Am. Pet. ("Opp'n") at 13, ECF No. 28. At the

hearing on this Petition, however, Mr. Young's attorney represented that Mr. Young "didn't testify because he didn't meet with his lawyers before the bond hearing, so he wasn't prepared to testify," noting that such "testimony can be binding on and affect his removal proceedings that have yet to happen." Hearing Tr. at 22:19-23. The Government did not dispute this assertion. Mr. Young has appealed the IJ's Bond Order to the Board of Immigration Appeals ("BIA"). Gold Decl. ¶ 29.

The Petition was filed *pro se* on May 29, 2026. ECF No. 1. That same day, this Court issued an Order to Show Cause and a Stay of Removal, directing the Government to file a letter addressing, among other things, whether there was any basis to distinguish this case from the Second Circuit's decision in *Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d. Cir. 2026). *See* ECF No. 3. On June 5, 2026, the Government filed its opposition to the Petition for Writ of Habeas Corpus. ECF No. 7. On June 10, 2026, the Court entered an order requesting the Clerk of Court to attempt to locate *pro bono* counsel for Mr. Young. ECF No. 9. On June 25, 2026, counsel entered an appearance on behalf of Mr. Young. ECF No. 10. The Court granted leave for Mr. Young to file an Amended Petition, with renewed briefing. ECF No. 12. Mr. Young filed an Amended Petition on July 28, 2026. ECF No. 21. The Government filed its Opposition on August 7, 2026. ECF No. 28. Mr. Young replied on August 14, 2026. ECF No. 29.

Oral argument on this Petition was held on August 31, 2026. At the conclusion of the hearing, the Court ordered that the petition be **GRANTED** and that Mr. Young be released immediately, with this Opinion to follow.[1]

---

[1] To the extent that this written Opinion conflicts with the Court's oral ruling, it is this written Opinion that controls.

## DISCUSSION[2]

Mr. Young's principal argument is that he was denied due process because, at his bond hearing, the Immigration Judge placed the burden on him to establish that detention was not justified, rather than on the Government to show that it was. As explained below, the Court agrees with that contention. But the Court, upon review of the record in this case, determines that Mr. Young also suffered from an antecedent due process violation when Respondents detained him pursuant to § 1226(a) without making an initial individualized assessment as to the propriety of detention based on whether Mr. Young presented a danger to the community or a risk of flight. The Court grants relief on the basis of that initial violation, and in the alternative on the basis of the IJ's failure to allocate the burden properly at Mr. Young's bond hearing.

The Court begins by addressing the threshold question of administrative exhaustion and then considers these two merits issues through the applicable due process framework set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976).

### I. Exhaustion of Administrative Remedies

The Government argues that Mr. Young must exhaust administrative remedies—here by appealing his bond determination to the BIA—before this Court can award relief, and that no exception to the exhaustion requirement applies here. Opp'n at 8-12. Courts generally require "administrative exhaustion before immigration detention may be challenged in federal court by a writ of habeas corpus," as a "prudential matter." *Quintanilla v. Decker*, No. 21 Civ. 417, 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021). However, such exhaustion is a prudential consideration only and not a "statutory requirement." *Id.* Courts in this Circuit may excuse

[2] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

exhaustion where certain exceptions apply, including when "(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question." *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003).

Several of these exceptions apply here. First, as discussed, *infra*, the Government did not conduct an individualized custody assessment *at the time* that Mr. Young was detained pursuant to § 1226(a), such that any *post-deprivation* review would be inadequate. *See Lopez Benitez*, 795 F. Supp. 3d at 497-98 ("Neither an immigration judge nor the Board of Immigration Appeals is positioned to properly adjudicate such a claim—any relief that either could award would necessarily be after-the-fact."); *Tumba v. Francis*, 813 F. Supp. 3d 394, 406 (S.D.N.Y. 2025) ("[T]he Government's violation of Petitioner's constitutional rights originated with her detention in the first instance," such that post-deprivation administrative remedies are inadequate). Second, available administrative remedies would be futile, because the primary claim Mr. Young raises—i.e., that the IJ committed legal error by placing the burden of proof on him to establish that detention is not warranted—would necessarily fail before an IJ, because the claim is foreclosed in immigration court by BIA precedent. *See J.C.G. v. Genalo*, No. 24 Civ. 8755, 2025 WL 88831, at *5 (S.D.N.Y. Jan. 14, 2025) (collecting cases); *Matter of Adeniji*, 22 I. & N. Dec. 1102, 1112-13 (BIA 1999) (placing burden on noncitizen seeking redress), *modified on other grounds*, *Matter of Garcia Arreola*, 25 I. & N. Dec. 267 (B.I.A. 2010). And third, his claims raise a substantial constitutional question, which an IJ does not have jurisdiction to consider. *Cf. J.C.G.*, 2025 WL 88831, at *5 ("The Board lacks jurisdiction to reach Petitioner's constitutional claims.").

Accordingly, Mr. Young is excused from administrative exhaustion.

## II. The Merits

### A. Legal Standard

The Fifth Amendment's Due Process Clause prevents the Government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). It is well established that such protection extends to noncitizens, including those who are in removal proceedings. *See id.* at 693. And an LPR "returning from a brief trip has a right to due process just as would a continuously present" LPR. *Singh v. Blanche*, No. 26 Civ. 5370, 2026 WL 2198833, at *1 (S.D.N.Y. July 30, 2026) (*citing Landon v. Plasencia*, 459 U.S. 21, 31-32 (1982)).

In the Second Circuit, the "*Mathews v. Eldridge*, 424 U.S. 319 (1976), balancing test applies when determining the adequacy of process in the context of civil immigration confinement." *Chipantiza-Sisalema v. Francis*, No. 25 Civ. 5528, 2025 WL 1927931, at *2 (S.D.N.Y. July 13, 2025). "The determination of what procedures are required under the Fifth Amendment requires consideration of: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation of that interest through the procedures used; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Id.*

### B. Application

#### 1. The Private Interest

Mr. Young's detention implicates "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). A person's liberty cannot be abridged without "adequate procedural protections."

*Zadvydas*, 533 U.S. at 690. That is, a person "is entitled to 'adequate procedural protections' *before* being deprived of [his] liberty." *Mcdonald v. Francis*, No. 25 Civ. 09355, 2025 WL 3295906, at *4 (S.D.N.Y. Nov. 26, 2025) (emphasis added, quoting *Zadvydas*, 533 U.S. at 690), *appeal withdrawn*, No. 26-204, 2026 WL 1196145 (2d Cir. Feb. 12, 2026). And specifically here, the statutory provision and implementing regulations under which Mr. Young was detained require an initial individualized assessment of flight risk and dangerousness at the time of detention.

Section 1226(a) provides that, "pending a decision on whether [an] alien is to be removed from the United States," the Attorney General "may . . . detain" the noncitizen or "may release" the noncitizen on "bond" or "conditional parole." 8 U.S.C. § 1226(a). When the Government exercises its discretion to detain a person under this provision, "§ 1226(a) and its implementing regulations require ICE officials to make an individualized custody determination." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020), *appeal withdrawn sub nom. Velesaca v. Wolf*, No. 20 Civ. 2153, 2020 WL 7973940 (2d Cir. Oct. 13, 2020). Specifically, 8 C.F.R. § 1236.1(c)(8) delegates to DHS officers the authority to grant bond or conditional parole, and pursuant to such authority, a DHS officer must make an individualized custody determination based on two factors—whether the noncitizen is a "danger to property or persons" and is "likely to appear for any future proceeding." Consistent with that requirement, ICE has, in many cases involving detention under § 1226(a), utilized a "*Velesaca* worksheet" to memorialize its detention determination, "an internal risk-assessment tool ICE uses to determine whether a detained noncitizen should be granted bond, released on conditional parole, or detained without bond while

awaiting immigration court proceedings." *Wang v. Mullin*, No. 26 Civ. 6289, 2026 WL 2720593, at *2 n.2 (S.D.N.Y. Sept. 15, 2026).[3]

Here, however, there is no evidence in the record that the Government made an individualized determination regarding the need for Mr. Young's detention. As noted, when he was arrested, he was issued a Notice to Appear, but as the Government explained at the hearing on the Petition, the NTA addresses only the basis for *removal* (i.e., his 1997 conviction for child endangerment), and not whether *detention* is appropriate pending his removal proceedings. *See* Hearing Tr. at 78:7-11 (attorney for the Government explaining that the NTA "states what the basis for removal is," which "is distinct [from] the question of . . . what is the proper custody determination."). At the hearing, the Government cited a Form I-286 Notice of Custody Determination ("NCD"), ECF No. 6-2, and a Form I-200 warrant for Young's arrest, ECF No. 6-3, as providing the basis for Mr. Young's initial custody determination. Hearing Tr. at 78:14-79:18. But neither of those documents addresses whether Mr. Young presented a danger to the community or of risk of flight to justify his detention; the NCD simply states that a determination of detention has been made, *see* ECF No. 6-2, and the I-200 is an arrest warrant indicating a determination that Mr. Young is removeable based on the execution of a charging document to initiate him removal proceedings and the pendency of those proceedings, *see* ECF No. 6-3.

---

[3] Notably, the regulatory scheme describes a bond hearing before an immigration judge as taking place "*[a]fter* an initial custody determination," at which "the respondent may . . . request amelioration of the conditions under which he or she may be released." 8 C.F.R. § 236.1(d) (emphasis added); *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 527 (2021) ("*If DHS denies the alien's request*, the alien may request a bond hearing in front of an immigration judge."). That is, a bond hearing is not the place where "an initial custody determination" shall be made, but where an *appeal* of such a determination takes place. *Tumba*, 813 F. Supp. 3d at 406 (emphasis added).

Moreover, there is no *Velasaca* worksheet in Mr. Young's file, and at the hearing on his Petition, the Government acknowledged that it was unaware whether one was ever completed or if any analogous determination was ever made with respect to Mr. Young's detention. *See* Hearing Tr. at 80:15–81:1 (noting the absence of any *Velesaca* worksheet (referred to in the transcript as a "*Valesco* determination") in Mr. Young's file). "Considering the complete absence of any reason for Petitioner's [detention] under Section 1226 . . . in the record . . . this Court cannot conclude that [his] . . . []detention is compliant with the mandates of the Due Process Clause." *Tumba*, 813 F. Supp. 3d at 404-05.[4]

Mr. Young asserts other important interests as well. At the time of the hearing on his habeas petition, he had been detained for approximately seven months. He experienced significant health issues related to, among things, his Type 2 diabetes. Gold Decl. ¶¶ 23-25; Decl. of Rogent Young ¶ 14, ECF No. 30. *See Ozturk v. Trump*, 783 F. Supp. 3d 801, 812 (D. Vt. 2025) (considering petitioner's health as among extraordinary circumstances warranting relief); *Pichardo Sosa v. Warden of Orange County Corrections*, No. 26 Civ. 2304, 2026 WL 1803814,

---

[4] To the extent that the Government contends that the execution of a warrant to initiate removal proceedings, by itself, constitutes a sufficient basis to detain Mr. Young, that would contravene the specific commands of 8 C.F.R. § 1236.1(c)(8), which directs the appropriate DHS officer to consider whether a noncitizen subject to detention under § 1226(a) is a "danger to property or persons" and is "likely to appear for any future proceeding." It would also contravene the overall statutory scheme. Section 1226(a) authorizes detention on a discretionary basis for noncitizens subject to a decision on whether they are to be removed from the country. *See* 8 U.S.C. § 1226(a) (providing that the Government "*may* release the alien on bond . . . or conditional parole") (emphasis added). It is not a mandatory detention statute. *Compare with* 8 U.S.C. § 1225(b) (providing that a noncitizen who is "seeking admission is not clearly and beyond a doubt entitled to be admitted . . . *shall* be detained") (emphasis added) *and* 8 U.S.C. § 1226(c) (providing for mandatory detention for noncitizens inadmissible for certain reasons, including having committed certain categories of crimes). *See also Barbosa da Cunha v. Freden*, 175 F.4th 61, 72-73 (2d Cir. 2026) (explaining difference between mandatory and discretionary detention statutes). Authorizing detention based solely on the fact that a person is in removal proceedings would, in essence, convert § 1226(a)'s discretionary detention system into a mandatory one.

at *5 (S.D.N.Y. June 23, 2026) (same); *O.F.C. v. Almodovar*, No. 25 Civ. 9816, 2026 WL 74262, at *9 (S.D.N.Y. Jan. 9, 2026) (same). Mr. Young's detention also posed a severe financial burden on his family, who have fallen behind on their bills and lost their car. Gold Decl. ¶ 14. One of his children has paused her plans to attend college as a result. *Id.* And Mr. Young's father, who suffers from Parkinson's disease, also experienced hardship during Mr. Young's detention. *Id.* ¶ 15. *See Peguero v. Arteta*, No. 26 Civ. 1715, 2026 WL 821428, at *4 (S.D.N.Y. Mar. 25, 2026) (considering family circumstances of petitioner among relevant interests under the first *Mathews* prong); *J.R.U. v. Genalo*, No. 26 Civ. 4332, 2026 WL 1864975, at *14 (S.D.N.Y. June 29, 2026) (same); *Pichardo Sosa*, 2026 WL 1803814, at *5 (same).

In sum, Mr. Young asserts a weighty interest in his liberty generally, and in an individualized custodial determination at the time of his detention in accordance with statutory and regulatory requirements specifically. He also asserts various other important health- and family-related interests. Accordingly, the first *Mathews* factor weighs heavily in his favor.

**2. The Risk of Erroneous Deprivation**

Here, the risk of erroneous deprivation is high for at least two reasons. First, as noted above, the Government did not make any kind of individualized determination as to whether detention was appropriate when detaining Mr. Young, contrary to the applicable statutory and regulatory scheme. But "[t]he purpose of requiring an exercise of discretion prior to the decision to detain a noncitizen who is not subject to mandatory detention is to prevent an erroneous deprivation of liberty." *Lopez Benitez*, 795 F. Supp. 3d at 495. Quite obviously, a practice of "detain first, ask questions later" creates a high risk that someone will be detained erroneously.

Second, various features of Mr. Young's bond hearing further heightened the risk of erroneous deprivation. Most significantly, the IJ denied his request for release on bond after placing the burden on Mr. Young to establish that he was not a danger to the community. But

allocating the burden in this way "introduces a substantial risk of the erroneous deprivation of rights." *J.C.G.*, 2025 WL 88831, at *8. As the Second Circuit has explained in the context of prolonged detention, "we must require the government to bear the burden of proving the need for continued detention. Otherwise, 'the risk of an erroneous deprivation' of a detainee's liberty interest would remain unacceptably high." *Black v. Decker*, 103 F.4th 133, 155 (2d Cir. 2022) (*quoting Mathews*, 424 U.S. at 335). That is in part because "proving a negative (especially a lack of danger) can often be more difficult than proving a cause for concern," *id.* at 156, such that placing the burden on the petitioner to show that detention is not justified means that "ambiguities, or lack of information, in the record result in an adverse inference against the detainee." *Velasco Lopez*, 978 F.3d at 847. Thus, courts in this District have concluded by an overwhelming consensus that, at a bond hearing, the Government must bear the burden of proving by clear and convincing evidence that the noncitizen poses a risk of flight or a danger to the community. *See J.C.G.*, 2025 WL 88831, at *7 (collecting cases); *Quintanilla v. Decker*, No. 21 Civ. 417, 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021) (collecting cases); *Jimenez v. Decker*, No. 21 Civ. 880, 2021 WL 826752, at *5-8 (S.D.N.Y. Mar. 3, 2021); *Fernandez Aguirre v. Barr*, No. 19 Civ. 7048, 2019 WL 3889800, *2-3 (S.D.N.Y. Aug. 19, 2019); *Velasco Lopez v. Decker*, No. 19 Civ. 2912, 2019 WL 2655806, at *3 (S.D.N.Y. May 15, 2019); *Linares Martinez v. Decker*, No. 18 Civ. 6527, 2018 WL 5023946, at *5 (S.D.N.Y. Oct. 17, 2018).[5]

---

[5] The Court is aware that at least two decisions from courts in the Second Circuit have concluded otherwise, *see Huanga v. Decker*, 599 F. Supp. 3d 131, 139-46 (S.D.N.Y. 2022); *Mahmodi v. Marich*, No. 25 Civ. 6762, 2026 WL 113473, at *4-9 (W.D.N.Y. Jan. 15, 2026), but is ultimately persuaded by the reasoning employed by the vast majority of district judges in this Circuit for the proposition that the burden of proof at a bond hearing for a detainee held under § 1226(a) is properly placed on the Government

Indeed, here, the IJ's placement of the burden on Mr. Young affected how she considered the evidence, leading her to draw a negative inference from Mr. Young's lack of testimony about his 1997 conviction. *See* Bond Order at 2-3. But there is an uncontroverted explanation as to why Mr. Young did not testify—namely, that he did not have an opportunity to meet with his lawyer prior to the bond hearing, *see* Hearing Tr. at 22:19-23, and the stakes were particularly high because any testimony that he gave at the hearing could be used in his removal proceedings. And here, the IJ's negative inference was quite consequential because, as explained below in the Court's discussion of the proper remedy, under a proper allocation of the burden, the evidence in the record was insufficient to support Mr. Young's continued detention.[6]

Another aspect of the bond hearing created a significant risk of error: the IJ's failure to consider alternatives to detention. An IJ's "consideration of alternatives to detention . . . guard[s] against the risk of [the petitioner's] continued detention where less restrictive means are available to protect the public." *D.C. v. Noem*, 825 F. Supp. 3d 309, 326 (S.D.N.Y. 2026). Conversely, there is a "'risk of an erroneous deprivation' of the noncitizen's liberty if alternatives to detention and ability to pay are not considered at the ordered bond hearing is the focus of [the court's]

---

[6] Mr. Young also argues the burden at any bond hearing should be placed on the Government given the length of his detention, which at the time of the hearing on his Petition, had stretched to approximately seven months. Under the Second Circuit's decision in *Black v. Decker*, the Due Process clause requires that a noncitizen subject to prolonged detention (in that case, seven months) receive a bond hearing at which the government must bear the burden of proof of establishing that continued detention is justified by clear and convincing evidence. *See* 103 F.4th at 155. While the Government disputes that it must bear the burden in this context, it was unable at the hearing to cite any examples of cases where a court ordered a bond hearing under *Black*, but placed the burden on the petitioner. *See* Hearing Tr. at 68:10-15. Thus, although Mr. Young did receive a bond hearing approximately four months after being detained, he had, at the time of the hearing on his Petition before this Court, been detained for seven months, which is "unreasonably prolonged" under *Black*, 103 F.4th at 137, 143, 150-51, and had not received a constitutionally adequate bond hearing with the appropriate allocation of the burden—which constitutes another basis for relief in this case.

concern." *Black*, 103 F.4th at 158. Thus, numerous courts in this District have held that "failing to consider alternatives to detention when assessing dangerousness violates an individual's due process rights." *Beltran Marroquin v. Genalo*, No. 24 Civ. 6376, 2025 WL 3241161, at *4 (S.D.N.Y. Nov. 30, 2025) (collecting cases); *see also Mendoza v. Noem*, No. 26 Civ. 1260, 2026 WL 1470652, at *7 (S.D.N.Y. May 26, 2026).

In sum, the Court concludes that various aspects of Mr. Young's detention, including (1) the failure to conduct an individualized custody determination at the time of detention and (2) the conduct of his bond hearing—in which the burden of justifying release was placed on Mr. Young, and the IJ failed to consider alternatives to detention—created a significant risk of error. Accordingly, the second *Mathews* factor also weighs heavily in favor of relief.

**3. The Government's Interest**

The Government argues that it "retains substantial interests in protecting the public and administering immigration custody proceedings in an orderly manner." Opp'n at 17. These are undoubtedly weighty interests. But the Government does not explain how these interests would be harmed by the procedural safeguards that it opposes in this case—i.e., an individualized custody determination prior to or at the time of detention under § 1226(a); and, where such detention occurs, a bond hearing at which the Government would bear the burden of justifying continued detention by clear and convincing evidence.

Start with an individualized custody determination at the time of detention. First, the Court cannot conceive of any reason, and the Government offers none, why making an individualized determination about whether someone presents a danger when detaining them would harm the Government's interest in protecting the public. And as for the Government's interest in administering custody proceedings in an orderly manner, the applicable regulation requires that, when detaining a noncitizen under § 1226(a), a DHS officer must make an initial assessment as to

whether that person is a "danger to property or persons" and is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8). Compliance with that regulation, rather than blanket detention for anyone deemed removeable, furthers rather than detracts from the Government's interest in orderly custody proceedings. Indeed, this is how ICE now seems to typically operate in practice, at least in this District. As noted above, in many cases involving detention under § 1226(a) in this District, ICE has utilized a simple one-page "*Velesaca* worksheet" to memorialize the basis for its detention determinations, *Wang*, 2026 WL 2720593, at *2 n.2—and there is no indication that this relatively simple exercise has been onerous in any way, or otherwise detrimental to the Government's interests in protecting public safety or in ensuring the orderly administration of custody proceedings.[7]

Second, before this Court, the Government disclaimed any argument that its asserted interests hinged on the placement of the burden at a bond hearing. *See* Hearing Tr. at 57:19-24 ("[T]he government's ultimate interests are public safety and order of administration of immigration custody, rather than burden allocation for its own sake. . . . I would not contend that public safety itself requires the burden to remain on Mr. Young. . . ."). That is, the Government declined to take the position that the interests it cites here are advanced by the placement of the burden on the detainee at a bond hearing. The Court therefore cannot find that the Government's asserted interests would be harmed by requiring it to bear the burden at a bond hearing to justify continuing detention by clear and convincing evidence.

Accordingly, the Court finds that the third *Mathews* factor, the Government's interest, does not weigh against relief.

---

[7] For purposes of this opinion, the Court assumes without deciding that completing the *Velasaca* worksheet is sufficient to discharge the Government's obligation to conduct an initial custody determination for detention under § 1226(a).

## III. Relief

Having concluded that relief is appropriate, the remaining issue is whether such relief should be immediate relief from custody, as requested by Mr. Young, or a new bond hearing with the burden properly allocated on the Government to justify continued detention. The Court concludes that immediate release is the appropriate relief under the facts of this case, for two reasons.

With respect to the first violation—the lack of an initial detention determination—a *post hoc* remedy is, by definition, inapt. "[G]iven the nature of the constitutional violation Mr. [Young] sustained here—i.e., Respondents' failure to conduct any kind of individualized assessment *before* detaining him—any post-deprivation review by an immigration judge would be inadequate." *Lopez Benitez*, 795 F. Supp. 3d at 497. A bond "hearing is no substitute for the requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause." *Chipantiza-Sisalema*, 2025 WL 1927931, at *3; *cf. Velesaca*, 458 F. Supp. 3d at 241 ("[T]he fact that Plaintiffs may seek review by an IJ of their initial bond determination does nothing to mitigate the harm to Plaintiffs in the time they are in detention awaiting review."). Immediate release is the appropriate remedy where, as here, a noncitizen's "detention was illegal from the start because of the lack of any due process." *Tumba*, 813 F. Supp. 3d at 407. "This is particularly so given that '[d]etention under § 1226(a) is frequently prolonged because it continues until all proceedings and appeals are concluded.'" *Lopez Benitez*, 795 F. Supp. 3d at 497 (quoting *Velasco Lopez*, 978 F.3d at 852).

The Government's position that it can forgo making an individualized custodial determination at the time of detaining a noncitizen under § 1226(a), and can simply cure any violation *post hoc*—amounts to license for categorical mass detention. Due process demands instead that noncitizens subject to detention as a matter of discretion under §1226(a) receive an

initial individualized custody determination, in accordance with regulatory requirements and the broader statutory scheme. *See* 8 C.F.R. § 1236.1(c)(8). On that basis alone, the Court concludes that a *post hoc* remedy is insufficient, and that immediate release is the appropriate remedy.

But under the circumstances of this case, there is a second reason why immediate release is the appropriate remedy rather than a new bond hearing: where, as here, "the existing record indicates that the Government could not possibly meet its heightened burden to justify continued detention, release is appropriate." *W.A.C. v. Rokosky*, 836 F.Supp.3d 577, 587 (D.N.J. 2026); *see also Pichardo Sosa*, 2026 WL 1803814, at *7-8. As to the first relevant factor, risk of flight, the Government disclaimed that it was relying on flight risk as a basis to continue detaining Mr. Young. *See* Hearing Tr. at 30:11-13. And while the IJ's written decision did not reach this issue, she noted in her oral opinion that she "d[oes] not believe he is a flight risk." Bond Hearing Tr. at 16. Accordingly, risk of flight cannot justify detention in this case.

The issue, then, is whether the Government could carry its burden of establishing dangerousness based on clear and convincing evidence. Upon review of the record, the Court concludes that it could not. Mr. Young has lived as a lawful permanent resident in the United States for more than 30 years; has several adult U.S.-citizen children, including two who serve in the military; and is the primary financial support for his U.S.-citizen spouse and his U.S.-citizen minor children. He does have three criminal convictions, which form the sole evidentiary basis for the Government's position that Mr. Young poses a danger to the community. *See* Hearing Tr. at 27:3-29:34 (Government disclaiming reliance on any other evidence, such as Mr. Young's 2025 arrest). But these three convictions for non-violent offenses—consisting of two misdemeanors and one traffic violation—occurred years ago, and are not sufficient to carry the Government's burden. The most recent conviction was for a misdemeanor for operating a vehicle without a valid license in 2018, approximately eight years ago. The most serious offense—which is the basis for

the Government's effort to remove Mr. Young from the country—was a non-violent misdemeanor committed almost 30 years ago. *Cf. W.A.C.*, 836 F.Supp. 3d at 587 (holding that the government could not meet its burden to establish dangerousness by clear and convincing evidence based a "more than a decade old" conviction for non-violent offense); *Pichardo Sosa*, 2026 WL 1803814, at *8 (holding that Government could not meet its burden of establishing dangerousness by clear and convincing evidence based on "non-violent offenses [that] were committed almost a decade ago"). Mr. Young has fully served his sentences for these offenses, none of which were incarceratory.

It is difficult to see how these offenses, which the sentencing courts concluded did not merit incarcerating Mr. Young at the time he committed them, should merit detention on the basis of purported dangerousness many years later. Courts in this Circuit have held that longtime residents who, like Mr. Young, have strong family ties and/or have committed only minor non-violent offenses are not a danger to the community or a risk of flight. *Cf. Guerrero v. Decker*, No. 19 Civ. 11644, 2020 WL 1244124, at *5 (S.D.N.Y. Mar. 16, 2020) ("[T]he Government did not meet its burden to establish by clear and convincing evidence that [petitioner] — a man who has resided in Suffolk County for 15 years and whose criminal history is limited to non-violent misdemeanor convictions — posed a danger to the community or a risk of flight"); *Pichardo Sosa*, 2026 WL 1803814, at *8 (noting that "[c]ourts in this District have held that longtime residents who . . . have strong family ties and/or have committed only minor non-violent offenses are not a danger to the community"); *D'Alessandro v. Mukasey*, No. 08 Civ. 914, 2009 WL 799957, at *3 (W.D.N.Y. Mar. 25, 2009) (finding that there is "no evidence in the record whatsoever to support a finding that [petitioner] is a flight risk or is a danger to the community" where petitioner has "strong family ties" in the form of a wife and son who legally reside in the U.S.), *aff'd*, 2009 WL 931164 (W.D.N.Y. Apr. 2, 2009).

Moreover, Mr. Young has renewed his lawful permanent residence status at least twice since his 1997 conviction, and the Government did not see fit to deny renewal of his green card on the basis of that offense. He has left and reentered the country three times between his most recent conviction in 2018 and his most recent trip abroad earlier this year (including two trips in 2024 and one in 2025), but the Government, despite being aware of Mr. Young's convictions, allowed him re-entry and did not seek to detain him on any of these occasions. Hearing Tr. at 24:6-15. There has been no relevant change in circumstances since these trips abroad in 2024 and 2025 that would explain why the Government sought to detain him when he re-entered the country after a brief overseas visit earlier this year. *Id.* at 15:24-16:2. As the Government concedes, these events "have some evidentiary significance," Opp'n at 20, in that the Government's own actions cut against the notion that Mr. Young presents such a danger to the community that he must be detained while his removal proceedings play out.[8]

The Government attempts to distinguish this case from *Pichardo Sosa* primarily by arguing that the petitioner in that case had committed only "nonviolent offenses committed almost a decade earlier," which the Government contrasts to Mr. Young's 1997 conviction for child endangerment.

---

[8] In *Pichardo Sosa*, this Court stated that the renewal of a green card despite a previous criminal conviction "necessarily entailed a determination that [a noncitizen] was not dangerous or a flight risk." 2026 WL 1803814, at *8. As the Government correctly points out in this case, however, this was something of an overstatement, because while the process for renewal of LPR status entails a consideration of the noncitizen's criminal history generally, it does not necessarily entail an explicit determination as to dangerousness or flight risk specifically. *See* Opp'n at 20-21. That being said, under the facts of this case, the Government's repeated decisions to renew Mr. Young's LPR status weigh against the notion that he presents a danger to the community. 8 C.F.R. § 103.2(b)(9) allows USCIS to require LPRs seeking to renew their status to submit to biometric screening, which entails a criminal background check. Under 8 U.S.C. § 1227(a)(2)(E), crimes of child abuse and child neglect are removeable offenses. Here, the Government was required to conduct a background check of Mr. Young, and despite his 1997 conviction, subsequently renewed his LPR status several times, indicating that the Government had determined that he was *not* in fact removeable on the basis of that offense.

Opp'n at 20. But the Second Circuit has explained that child endangerment under New York law is *not* categorized as a crime of violence. *See United States v. Martinez*, 991 F.3d 347, 354 (2d Cir. 2021). And while it is possible that a person could engage in violent conduct when committing a crime that is not, based on its elements, categorized as a crime of violence, there is no evidence that Mr. Young did so here. The Government argued at the hearing that the absence of such evidence is the result of Mr. Young's refusal to testify at his bond hearing, Hearing Tr. at 51:2-16; but that misapprehends the proper allocation of the burden, which must be on the Government to establish that detention is appropriate. It is improper to draw a negative inference from Mr. Young's decision not to testify, particularly given the uncontested explanation as to why Mr. Young chose not to do so: i.e., because he was not given an opportunity to meet with his lawyer prior to his bond hearing.

In sum, there is no affirmative support for the Government's suggestion that Mr. Young committed a violent crime in 1997.[9] Accordingly, under a proper allocation of the burden, a reasonable factfinder could not conclude otherwise.

**IV. The Government's Sealing Motion**

The Government has filed a consent motion to seal a declaration concerning Mr. Young's medical and mental health records. ECF No. 26. The declaration is unquestionably a judicial document, and it is submitted in connection with Mr. Young's petition, so a higher presumption of public access attaches. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir. 2006). However, for the reasons stated at the August 31, 2026 hearing, namely that the Declaration concerns sensitive medical and mental health information, the interest in sealing outweighs the

[9] To be sure, dangerousness is not necessarily limited to acts of violence per se. But the Government's position in its briefing is that Mr. Young committed a "violent" crime, and there is no affirmative basis in the record for that position.

presumption of public access. *See* Hearing Tr. at 3:3-12; *United States v. Sattar*, 471 F. Supp. 2d 380 (S.D.N.Y. 2006).

Accordingly, the Government's motion is **GRANTED**.

## CONCLUSION

For the foregoing reasons, Petitioner's petition for writ of habeas corpus is **GRANTED**.

Respondents are further **ENJOINED** from re-detaining Mr. Young without a valid exercise of discretion consistent with this Order. *Cf. Hyppolite v. Noem*, 808 F.Supp.3d 474, 494-95 (E.D.N.Y. 2025). It is further **ORDERED** that, should Mr. Young be detained pursuant to a valid exercise of discretion pursuant to 8 U.S.C. § 1226(a), Respondents must provide him with a bond hearing at which Respondents bear the burden of proving by clear and convincing evidence that his continued detention is justified and that alternatives to detention are insufficient; and it is further **ORDERED** that, if Mr. Young is granted bond, respondents be **ENJOINED** from invoking the automatic stay provision at 8 C.F.R. § 1003.19(i)(2). *See J.M.P. v. Arteta*, 807 F. Supp. 3d 265, 299-301 (S.D.N.Y. 2025).

Counsel for Petitioner may file an application for attorney's fees and costs pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412 within the time provided by the Local Rules.

The Clerk of Court is respectfully requested to terminate ECF No. 26 and maintain ECF No. 27 under seal. The Clerk of Court is further directed to enter judgment in Petitioner's favor pursuant to F.R.C.P. 58, and to close this case.

SO ORDERED.

Dated: November 5, 2026

New York, New York

DALE E. HO
United States District Judge